UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 AUG 20 PM 2:32

U.S. DISTRICT COURT
N.D. OF ALABAMA

YVONNE MITCHELL,                        }
                                        }
          Plaintiff,                    }
                                        }
v.                                      }          CV 01-AR-362-S
                                        }
AMERICAN FAMILY CARE MEDICAL            }
CENTERS,                                }          ENTERED
                                        }
          Defendant.                    }          AUG 2 0 2002

## MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by defendant, American Family

Care Medical Centers ("American"). Simultaneously, the court must consider the motion filed

by plaintiff, Yvonne Mitchell ("Mitchell"), to "strike the affidavit of Dean A. Veren, M.D. and

additional evidence not produced previously contained in the reply brief" of American.

Mitchell asserts claims against her former employer, American, under Title VII of the

Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* She contends

that, by terminating her employment, American intentionally discriminated against her on the

basis of her gender. Though impossible to detect from reading the complaint, the court deduces

from the record and the averments in the complaint, that Mitchell is also claiming that American

retaliated against her, that American discriminated against her because she was pregnant, and that

she was subjected to a hostile work environment.

Just as the court began the time-consuming task of corralling all of the actual claims

Mitchell asserts into one cohesive, understandable format, the court faced the task of pouring

over hundreds of pages of repetitive, inconsequential facts that, more often than not,



demonstrated that if there is any "evidence" to support the various claims and allegations of Mitchell, that evidence is not really evidence, but rather Mitchell's conclusions or illusions.

## I. STATEMENT OF MATERIAL FACTS

American is a medical facility offering primary care services with offices located in Alabama and Mississippi.[1]  Mitchell was hired by American in March 1997 as Director of American's Claims Processing Center ("Center").  The Center processed and collected bills for medical services rendered by American[2] at eighteen of its clinics.  It also processed claims with insurance companies and other third-parties responsible for the payment of services rendered to patients.  Part of the Center's responsibilities included "making sure that the claims/bills were paid in a timely manner" and collecting American's accounts receivables.  (Def. Br. Supp. Mot. Summ. J. at 1.)  As Director of the Center, Mitchell's duties involved general management of the Center to "ensure that monies owed to [American] were timely collected.  (*Id.* at 1-2.)  One of Mitchell's weekly duties was to report the amount received by American from Blue Cross and Blue Shield of Alabama ("BC&BS") to her supervisor.  As she was aware, Mitchell's performance was judged in part by the Average Days in Accounts Receivables ("ADAR"), "which represented the average length of time it took for [American] to collect the money owed to it for medical services rendered."[3]  (*Id.* at 3.)  American's senior management set the goal for

_____

[1]American's corporate offices are located in Hoover, Alabama.

[2]The Center was located in Centerpoint, Alabama.

[3]Mitchell defines the ADAR as the "average days in accounts receivables that is calculated from the time a patient is treated at the facility until the money is collected from insurance." (Pl. Br. Opp'n Def.'s Mot. Summ. J. at 4.)  She testified in her deposition that she

2

Mitchell to reduce the ADAR to 50-54 days.[4]

Mitchell admits that when she was hired, she knew that American was experiencing problems with collecting payments in a timely fashion. In spite of this, American contends that, as of Fall 1997, Mitchell had not reached her goal of reducing the ADAR; rather, American says, without contradiction other than a flat denial, that the ADAR continued to increase.[5] In response to this increase, American's senior management decided to send Randy Johansen ("Johansen"), Chief Operating Officer, to work at the Center on a regular basis. Johansen was stationed at the Center from October or November of 1997 to February 1998; during this time, the ADAR was, according to American, "significantly reduced." (Def.'s Br. Supp. Mot. Summ. J. at 4.)[6]

At some point in the spring of 1998, Mitchell informed Vicki Jackson, American's Human Resources Director, and Joseph E. Hawley, Jr. ("Hawley"), Chief Financial Officer, that she was pregnant. At that time, she told management that she intended to work until the birth of her child and that she intended to take "extended sick leave and vacation" after the birth of her child. (Def. Br. Supp. Mot. Summ. J. at 5 (citing Mitchell Dep. at 118-20).)[7]

Beginning some time in February 1998, Johansen discontinued his work at the Center;

---

understood that "the longer the time it took to collect the accounts receivable, the worse it was for the company" and the "shorter the period of time, the better." (Mitchell Dep. at 55.)

[4]When Mitchell was hired, American's ADAR was 69 days.

[5]From March 1997 to September 1997, the ADAR increased from 68.94 days to 93.89 days, and the gross accounts receivables increased from $2.871 MM to $ 3.011 MM.

[6]From October 1997 to February 1998, and while Johansen was stationed at the Center, the ADAR decreased from 93.89 to 57.77. The gross accounts receivables also decreased from $3.011 MM to $2.798 MM.

[7]On September 11, 1998, Mitchell's child was born.

3

American contends that, thereafter, the ADAR again started to increase, rather than decrease "as senior management expected." (*Id.* at 5.)  In April 1998, American reviewed Mitchell's job performance; she was awarded what Mitchell calls a raise and a bonus.  Mitchell contends that, when she was evaluated, Hawley and Johansen indicated to her that "she had done a very good job" and that they were "pleased with the [accounts receivables] and other progress that had been made in the [Center]." (Pl.'s Br. Opp'n Mot. Summ. J. at 2.)  Mitchell further contends that, during the evaluation, she "asked if there was anything she needed to improve on and Johansen responded, 'No,' that he was very pleased with everything and reiterated that Mitchell had done a good job." (*Id.*)  "From [American's] standpoint, the increase in compensation and the bonus were provided to Ms. Mitchell to honor the commitments that were made to her when she was hired." (Def.'s Br. Supp. Mot. Summ. J. at 4-5.)  Mitchell also asserts that, during this review, she was not told how her future productivity would be measured.  Mitchell also denies that Johansen told her that he expected her performance to improve in the coming year.  She also contends that nothing was discussed during this review with respect to the ADAR number being high.

During the spring of 1998, American contends that the accounts receivables continued to increase while the weekly payments from [BC&BS] continued to decrease.  Following Johansen's departure in February 1998 and until May 1998, the ADAR increased from 57.77 to 68.72.  Hawley Mitchell's supervisor responded to this decline in performance by "meeting with [Mitchell] on a regular basis to try to assist her in bringing down the accounts receivables and the ADAR." (*Id.*)  In this same responsive vein, in May 1998, Hawley sent Don Johnston ("Johnston"), a financial consultant to American, to the Center to "perform analytical work" and

4

"attempt to identify the problem."  (*Id.*)

On June 24, 1998, Johansen and Hawley met with Mitchell to discuss the Center's poor performance.  "According to [Mitchell], she was told by [Johansen and Hawley] that if the performance of [the Center] did not immediately improve collections of accounts receivables that she, and possibly others, would be replaced."  (Def. Br. Supp. Mot. Summ. J. at 5-6 (citing Mitchell Dep. at 197-202).)  Though there are conflicts of the exact words used to convey this message, the gist of the message was that the jobs of those associated with the Center were in jeopardy if there were no improvements in the Center's performance.

Following this June 1998 meeting, accounts receivables and the ADAR increased, but gross revenues decreased and "collections from [BC&BS] were less than senior management expected.  This was the continuation of an alarming trend and needed to be corrected."  (Def. Br. Supp. Mot. Summ. J. at 6.)  To place the Center's performance of its assigned tasks and duties in a more concrete context, American has provided the following undisputed statistics:

> the ADAR increased from 58 days in February of 1998 to 74 days in June of 1998 and accounts receivables rose from $2.643 MM in April of 1998 to $2.901 MM in June of 1998.  Thus, ADAR increased by 27.5% and accounts receivables increased by almost 10%. . . . [BC&BS] payments dwindled from $566,000 in March of 1998 to $281,000 in June of 1998, while gross revenues decreased from $1.537 MM in January of 1998 to $1.153 MM in June of 1998.  Thus, the [BC&BS] payment decreased by 50%, while the gross revenues decreased by only 25%.

(Def. Br. Supp. Mot. Summ. J. at 12 (internal citations omitted).)  Thus, in July 1998, "Hawley decided that it would be in the best interest of [American] to terminate [Mitchell's employment] based upon her poor job performance as [the Center Director]," and he subsequently informed American's senior management of his recommendation.  (*Id.*)  American contends that both

Johansen and Dr. Bruce Irwin ("Dr. Irwin"), another member of American's senior management, "agreed that it was in the best interest of [American] to terminate [Mitchell] based upon her poor job performance, i.e. ADAR and receivables were increasing, not decreasing." (Def. Br. Supp. Mot. Summ. J. at 6.) Mitchell's employment was subsequently terminated on July 28, 1998.

Following Mitchell's discharge, American continued to pay her and provide her with all employment benefits until the birth of her child in September 1998. Following the birth of her child, Mitchell used the extended sick leave benefits and unused vacation time that she had acquired at American to continue receiving compensation through the end of September. American contends that Mitchell "was treated better than any other pregnant employee" at American. (Def. Br. Supp. Mot. Summ. J. at 6.)

Mitchell contends that, during her employment at American, Johnston made derogatory comments about her gender and about the fact that she was pregnant and that American created or allowed a hostile work environment to exist at the Center. To establish these claims, Mitchell points to the conduct of Johnston in making certain comments, the number and/or frequency of which are disputed, that Mitchell overheard and found offensive. The first statement that Mitchell alleges to have found offensive was Johnston's belief that he did not think that Mitchell should be working as many hours as she was working because she was pregnant and that he felt women should stay at home with their children. According to American, these statements were apparently made during conversations where Johnston recounted the difficulties that his daughter experienced during her pregnancy and while she was working. Second, Johnston allegedly stated that he felt "it was going to take a man to be in charge of [the Center], and that Dr. Irwin also felt this way." (Def. Br. Supp. Mot. Summ. J. at 15 (citing Mitchell Dep. at 122-23).) Third,

6

Mitchell alleges that Gale Jackson, one of her supervisors, told her that Johnston stated to Gale

Jackson, that "a man needed to be in charge of [the Center] and run the computers." (Def. Br.

Supp. Mot. Summ. J. at 15 (citing Mitchell Dep. at 159).)  Mitchell also contends that Johnston

did not like the receptionist, Heather Shear ("Shear").  She was also pregnant, and Mitchell

alleges that Johnston told her that American needed to "'get rid of her.'"  She further alleges that,

during a meeting, Johnston referred to Shear as "fat, hot and pregnant."

    Mitchell also argues that "almost immediately" after Johnston began working at the

Center, he

> began to undermine [her] position and authority.  He constantly stood in
> Plaintiff's office complaining about certain employees and telling her whom she
> should fire.  He especially complained about Gale Jackson, who took care of
> computer hardware problems, believing a man would do a much better job since
> this is a "man's job" anyway.

(Compl. ¶ 16.)  Mitchell also asserts that Johnston "always answered the phone when [Mitchell]

was paged.  He ordered [Mitchell] not to shut her office door."  (Compl. ¶ 18.)  In addition to

commenting that it would take a man to perform the tasks of the Center Director at a time when

accounts receivables were down, Mitchell argues that Johnston "became more and more involved

in [Mitchell's] day-to-day operations.  Finally he told [Mitchell], that he would replace her as

interim director during her maternity leave.  However, [Mitchell's] maternity leave was not

planned until September 2, 1998, two months away."  (Compl. ¶ 19.)

    In response to Johnston's conduct, Mitchell claims that she "went to see [Johansen][8] to

report her stress and discomfort with [Johnston's] behavior, which caused her to break out with

shingles due to the stress she was experiencing."  (Compl. ¶ 20.)  She further asserts that, soon

---

[8]American admits that Mitchell spoke to Johansen.

after this meeting, Johnston "threatened [her] with termination." (Compl. ¶ 21.)  American contends, however, that Mitchell never informed Hawley, Johansen, Vicki Jackson, or Dr. Irwin of this conduct.  American further argues that no one other than Johnston treated Mitchell in a discriminatory manner.

Mitchell also argues that Dr. Irwin made comments that contributed to the hostile work environment and that demonstrated Dr. Irwin's discriminatory animus.  Mitchell testified that, after Johnston had been working at the Center for a couple of weeks, Dr. Irwin "walked into my office, closed the door and said do you know why Mr. Johnston is out here, and I said no, sir. . . . And he said because you're pregnant and got up and walked out." (Mitchell Dep. at 101.)  She claims that she spoke with Johnston about Dr. Irwin's comment, and, in response, Johnston "basically said that he wasn't there to take [her] job and that he was only there to help [her] and that . . . he was only going to be there while [she] was out on maternity leave." (*Id.*)

Mitchell argues that this discriminatory conduct culminated in termination of her employment on July 28, 1998, "without warning or prior discipline." (Compl. ¶ 22.)  She contends that the "only explanation [she] received to justify her termination was 'things are not working out with you.'" (Compl. ¶ 23.)  Mitchell asserts that she was never told that "if she did not get the accounts receivables down she would be terminated nor if the [BC&BS] check was not larger she would be terminated.  No one ever told [Johnston] that either." (Pl. Br. Opp'n Def.'s Mot. Summ. J. at 4.)  To support her claims, Mitchell points out that, immediately following her discharge, Johnston became interim director of the Center.  Johnston held Mitchell's position until August 1998 when American hired another male as Mitchell's permanent successor.

8

American argues that "[n]o one, other than [Johnston], made any gender derogatory comments to or about [Mitchell]." (Def. Br. Supp. Mot. Summ. J. at 16 (citing Mitchell Dep. at 164-65, 183-85).) American further asserts that Johnston was not Mitchell's supervisor and that Johnston had no authority over Mitchell's employment. Mitchell avers, however, that she "was never told that Johnston was a consultant and not an employee of [American]." (Pl. Br. Opp'n Def.'s Mot. Summ. J. at 4.) Mitchell testified, when asked if anyone ever told her that Johnston was her supervisor, that Johnston and Hawley told her that she was supposed to report to Johnston. She further stated that she assumed that Johnston was her supervisor.

American contends that it has a "written and established policy prohibiting gender based [sic] discrimination that was not followed by [Mitchell]." (Answer, Sixth Defense, at 4.) When Mitchell was hired, she received a copy of American's Employee Handbook. The Handbook provided, in pertinent part:

> Any employee who believes that he/she is being sexually harassed or harassed on the basis of race, color, religion, gender, national origin, age or disability should immediately report his/her concerns to his/her supervisor, department manager, or the Human Resources Department. If a supervisor is involved in the conduct about which an employee is complaining, the employee should contact the next higher level of management or the Human Resources Department.

(Def. Br. Supp. Mot. Summ. J. at 2.) Mitchell testified that she knew she was obligated to notify her supervisor or Human Resources Department regarding any conduct that she perceived as harassment on the basis of gender. (Mitchell Dep. at 97.)

## II. Mitchell's Motion to Strike

Mitchell asks the court to strike the affidavit of Dr. Dean A. Veren, a physician who has reviewed Mitchell's medical records, and to strike the weekly report dated May 4, 1998 that

9

Mitchell sent to Hawley.  These exhibits were filed simultaneously with American's reply brief in support of its motion for summary judgment.  As grounds for her motion to strike, Mitchell states that "[she] cannot respond to this additional evidence at this point and will be prejudiced if this additional evidence goes unrebutted" and that the additional evidence "should have been produced during discovery, Rule 26 Mandatory Disclosures, and in Defendant's original Evidentiary Submission with its Motion for Summary Judgment."  From a review of the record, the court concludes that the supplemented evidence is not necessarily additional, unrebutted evidence.  The general facts  contained in the "supplementary evidence" appear in various portions of the voluminous record.  Consequently, the motion of Mitchell to strike the "additional evidence" will be denied.

III. American's Motion for Summary Judgment

A.      Gender & Pregnancy Discrimination

Insofar as Mitchell's pleadings and summary judgment materials purport to explain to the court the specific statutory discrimination claims asserted and the exact adverse employment actions and practices that substantiate such claims, Mitchell presents the court with the difficult task of wading through the voluminous and repetitive record to give her the benefit of the doubt and ascertain what she complains of in this lawsuit.  Thus, the court will assume that Mitchell asserts that her discharge constitutes both gender and pregnancy discrimination.  Title VII prohibits the termination of employment on the basis of gender.  Subsection (k) of 42 U.S.C. § 2000e defines discrimination because of or on the basis of sex to also prohibit discrimination based on pregnancy, childbirth, or related medical conditions.  Thus, the following discussion regarding Mitchell's gender and pregnancy discrimination claims are analyzed under the same

10

framework. *See Maddox v. Grandview Care Center, Inc.*, 780 F.2d 987, 989 (11th Cir. 1986).

    1.    Disparate Treatment, i.e., Discriminatory Discharge

Gender discrimination can be established by plaintiff's offering of direct evidence of discrimination, statistical proof of a pattern of discrimination, or circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Direct evidence of discrimination would be evidence, which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) (citations omitted). "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [gender]' will constitute direct evidence of discrimination." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990).[9]

No evidence offered by Mitchell meets this rigorous standard, and therefore, it does not constitute direct evidence. Mitchell argues that the following comments by Johnston constitute direct evidence of discrimination: alleged comments to Hawley regarding Mitchell's lack of time to devote to managing the Center because of the difficulties in her pregnancy, Johnston's expressions of his opinion that Mitchell should not have been working because she was pregnant, Johnston's alleged recommendation to Hawley that Mitchell be discharged "because he thought it would be better than her being at work while pregnant," Johnston's comments about another female who he described as "fat, hot, and pregnant," Johnston's inquiries to Mitchell about her

---

[9]"'An example of 'direct evidence would be a management memorandum saying, 'Fire Earley–he is too old.'" *Damon*, 196 F.3d at 1359 (quoting *Earley*, 907 F.2d at 1082).

plans for working during her pregnancy, and Johnston's expressions of his opinion that a

female's "place" was at home with her children.  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 15.)

Even if these comments, expressions, and inquiries were insistent and incessant, as alleged by

Mitchell, these comments alone do not indicate that American's management, namely Hawley,

Johansen, and Dr. Irwin, were motivated by any kind of discriminatory animus when they

decided to terminate Mitchell's employment.  At best, this evidence goes to the Johnston's state

of mind, and if that evidence is relevant to the discriminatory discharge issue now in question,

the evidence requires the court to infer that Johnston's interest in removing pregnant women

from the workforce somehow motivated American's management when they decided to

terminate Mitchell's employment.[10]  Thus, this evidence, by definition is circumstantial evidence,

and is best analyzed under the tripartite allocation of evidentiary production.

Under the *McDonnell Douglas* paradigm, plaintiff must prove a prima facie case of

gender discrimination by a preponderance of the evidence.  The burden of production then shifts

to defendant to articulate a legitimate, non-discriminatory reason for terminating plaintiff's

employment.  Plaintiff is then given the opportunity for rebuttal to show by a preponderance of

the evidence that the articulated reason offered by defendant is pretextual.  Throughout this

analytical framework, plaintiff retains the ultimate burden of persuasion that she has been the

---

[10]Mitchell alleges that there is more direct evidence.  She contends that, within two weeks of Johnston's arrival at the Center, Dr. Irwin told Mitchell that Johnston was working at the Center because Mitchell was pregnant.  This evidence indicates that, if American took any discriminatory actions and if any kind of discriminatory motive can be directly presumed from this statement, Mitchell's pregnancy was a motive in sending Johnston to the Center.  Mitchell does not assert a disparate treatment claim relating to Johnston being stationed at the Center.  This comment by Dr. Irwin does not indicate that Mitchell's pregnancy or gender were motivating factors behind the decision to discharge Mitchell; at best, the evidence can be used to circumstantially prove discrimination.

victim of intentional discrimination. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

For purposes of the Rule 56 motion, the court assumes without deciding that Mitchell has established a prima facie case of discrimination.[11]  Proceeding to the crux of the matter, the court finds that American has articulated a legitimate, non-discriminatory reason for terminating Mitchell's employment: Mitchell was discharged "because she did not adequately perform her essential job functions." (Def.'s Br. Supp. Mot. Summ. J. at 10.)  The burden on the employer is merely to provide an explanation that is legally sufficient to justify a judgment for the defendant. Regardless of the disputes of fact between Mitchell and American regarding whether Mitchell was ever notified of the poor quality of her performance and regarding the factors affecting the size of the BC&BS payments and the overall performance of the Center, the undisputed facts indicate that while Mitchell was at the helm of the Center without the assistance of Johansen, the Center struggled to collect the funds that American was owed.  Before Johansen dedicated his assistance to the Center, the number of days it took for American to collect on its accounts receivables (the ADAR figure) increased from 64.04 to 93.89, a total increase of 29.85 days.  In

---

[11]To establish a prima facie case of gender discrimination, the plaintiff must make the following showing: (1) that she belongs to a protected class; (2) that she was subjected to an adverse employment action; (3) that her employer treated similarly situated male employees more favorably; and (4) that she was qualified to do the job. *See McDonnell Douglas*, 411 U.S. 792 at 802.  "The central inquiry in evaluating whether the plaintiff has met his initial burden in a Title VII case is whether the circumstantial evidence presented is sufficient to create an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).  When a plaintiff establishes a prima facie case, a presumption that plaintiff was the subject of intentional gender discrimination arises. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 254 (1981).

13

the months between Johansen's departure from the Center and Mitchell's discharge,[12] the ADAR figure again increased from 57.77 to 74.01, a total increase of 16.24. During these same periods of Mitchell's tenure (before and after Johansen was stationed at the Center), the gross accounts receivables saw an overall increase of $281,880 and $103,293. While other factors could theoretically contribute to the increase in the accounts receivables, the combination of the increasing accounts receivables with the increasing ADAR figure indicates to the court that, at least to some degree, American was having to wait longer periods of time to receive the funds due to it from the provision of medical services.[13] Consequently, the court finds that American's articulated reason (that Mitchell did not adequately perform her essential job function, which were to collect the funds owed to American) for terminating Mitchell's employment is a legitimate and sufficient explanation to justify judgment for American and thus to remove the inference of discrimination.

Although poor job performance is such a legally sufficient explanation, the pertinent question now is whether Mitchell has created a jury triable issue regarding the validity of

---

[12]The court is not considering the data for the month of July 1998 because American did not have the financial information for that month available to them when the decision was made to discharge Mitchell. Instead, the most recent information that American's management relied upon in reaching the decision to terminate Mitchell's employment was date from June 1998. See Def.'s Br. Supp. Mot. Summ. J. at n.2.

[13]This conclusion is bolstered by looking to the performance of Mitchell's successors. The average of the ADAR figures for each of the months during which Mitchell served as the Center director without Johansen's assistance was 76.85; this figure is almost 17 days greater than the average calculation of ADAR for Mitchell's predecessor. The average of the ADAR figure for Mitchell's first successor was 72.62, 4 days less than Mitchell's average. Mitchell's second successor brought the average of the ADAR figures down to 62.74 during her tenure; thus, the average ADAR for Mitchell's second successor was 14 days lower than Mitchell's average.

American's articulated reason. In other words, the court must now consider whether American's
articulated reason for terminating Mitchell's employment is mere pretext for discrimination.

At this stage of the analysis, the plaintiff's burden to demonstrate pretext

merges with the plaintiff's ultimate burden of showing that the defendant
intentionally discriminated against the plaintiff. Put another way, once the
employer succeeds in carrying its intermediate burden of production, the ultimate
issue in the case becomes whether the plaintiff has proven that the employer
intentionally discriminated against [her] because of [her gender].

*Holifield*, 115 F.3d at 1565 (internal citations omitted). Thus, the focus of the case at this stage
is on the employer's "subjective intent and the motivation behind the defendant's adverse
employment actions directed at [the employee]." *Harris v. Shelby County Board of Education*,
99 F.3d 1078, 1084 (11th Cir. 1996). In persuading the court that she has been the victim of
intentional discrimination, the plaintiff may succeed "either directly by persuading the court that
a discriminatory reason more likely motivated the employer or indirectly by showing that the
employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

The court finds that Mitchell has not successfully attacked American's articulated reasons
either directly or indirectly. At the time Mitchell was discharged, the Center was experiencing its
second downward trend since the arrival of Mitchell as the Center's director. To help Mitchell
climb out of her first downward spiral, American made the decision to send Johansen to the
Center to help her. After the ADAR figure decreased for five months in a row (by a total of 21.4
days) and after it seemed that the Center was finally on the proper track to collect its accounts
receivables in a timely, acceptable fashion, Johansen returned to full-time dedication of his time
to his duties as Chief Operating Officer. By June 1998, American found the Center in its second
downward spiral of Mitchell's tenure. American argues that, at this point, it "acted as a

15

reasonable employer in terminating [the employment of] a manager who did not perform her essential job duties, i.e., collecting on a timely basis the accounts receivables of [American]." (Def.'s Br. Supp. Mot. Summ. J. at 11.)  With this point, the court must agree because Mitchell cannot and does not dispute those objective facts measuring the performance of the Center.

Though Mitchell does not dispute the actual data relevant to the performance of the Center during her tenure, she argues that other facts support the conclusion that American's reason for discharging her is pretextual.  She attempts to demonstrate pretext by disputing the truth of American's assessment of Mitchell's job performance.  She argues that American never told her that her performance was poor and unacceptable and that she received what she calls a bonus and raise in April 1998 at her annual performance review, and that, consequently, American cannot now claim that her performance was poor.[14]  In a similar vein, Mitchell attempts to establish pretext by arguing that American could not really have discharged her for poor performance because she was never disciplined for poor performance prior to her discharge and because she was not told why she was being discharged.  She argues that she was not only performing the essential functions of her job, but that she was performing them well.  And to support this argument, she points to her assertion that the largest BC&BS check received by American was remitted one week before her termination.

But the court cannot find that pretext must necessarily follow from the mere facts that Mitchell received a good review, bonus, or raise, that she was never disciplined for poor

---

[14]Though there are disputes of fact regarding whether Mitchell was ever told that her performance was poor, regarding whether Mitchell otherwise knew that American felt that Mitchell was not adequately performing her job, and regarding whether Mitchell actually received a bonus and raise in April 1998, these disputes are not material.  Furthermore, the existence of these disputed facts do not constitute pretext.

16

performance, that she was not told why she was being fired, and that American allegedly received its largest check ever from BC&BS. In fact, the court must go further and conclude that no genuine issue with respect to pretext exists because, at the time Mitchell was discharged the relevant evidence compels the conclusion that Mitchell was not performing like she was when she received the favorable reports from American and, as discussed above, the irrefutable data shows that Mitchell's performance and the performance of the Center deteriorated after the April 1998 review. And even though Mitchell may have been performing better with respect to increasing the Center's collections from BC&BS, it is not disputed that American looked to both objective and subjective factors, including, but not limited to, the size of the BC&BS check, the ADAR figure, and the size of the gross accounts receivables, in measuring the performance of the Center's director and in deciding to discharge Mitchell. Mitchell also tries to demonstrate pretext by arguing that the EEOC found that the Center experienced financial problems both before and after her employment at American. She proceeds further and argues that this court should find that American's articulated reasons for its employment action are pretextual because the EEOC found pretext. These arguments must fail, however.

In determining that Mitchell has failed to establish pretext and that there is no genuine issue sufficient to warrant a jury trial, the court finds instructive the Eleventh Circuit's articulation that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). Additionally, this court recognizes that "'while EEOC findings in general may be significant evidence, their probative force in individual cases varies considerably and is left to the

determination of the trial court;" this court refuses to hold in this case that the EEOC's finding of

cause, the EEOC's fact findings, and the EEOC's finding of pretext now require the court the

similarly find that American's articulated reasons for discharging Mitchell are pretext. *Moore v.*

*Devine*, 767 F.2d 1541, 1550 (11th Cir. 1985). Instead, the court finds persuasive the

determinations of the Seventh Circuit in *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 573

(7th Cir. 1998), where it concluded that the plaintiff could not  establish discrimination "simply

by suggesting that, in the final months of [the plaintiff's] employment, his performance was not

as bad as his reviews may suggest" and where the appellate court stated that "[a]n employer may

give annual salary increases as an incentive for future performance and . . . the fact [that the

plaintiff] received such increases does not suggest that he was performing adequately.  More

pointedly, the Seventh Circuit concluded that the receipt of annual salary increases and the

statements regarding the plaintiff employee's competency as a manager and the historical

difficulty of the plaintiff's job "do not suggest that [the employer's] reason for terminating [the

plaintiff's employment] were pretextual." *Id.*  Thus, just as the *Fairchild* plaintiff failed in his

attempt to create a jury-triable issue, so has Mitchell.

The undisputable fact is that the Center's performance was deteriorating after March

1998.  Mitchell, in her brief in opposition to the motion for summary judgment, attempts to "lay

off" blame for the inadequate performance of the Center on various other factors.  Though

Mitchell could be correct in some of her criticisms of management, it was management's

prerogative to conclude that Mitchell was the precipitating factor in the Center's poor collection

efforts.  And as explained above, Mitchell has failed to rebut this reason except in her own mind.

Thus, this court will not second-guess American's employment decision, even though American

18

may have been mistaken or imprudent in terminating Mitchell's employment. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (stating that federal courts do not sit as super-personnel department to re-examine an employer's decisions). Accordingly, because American has articulated a legitimate, non-discriminatory reason for terminating Mitchell's employment, because Mitchell has failed to rebut that reason with evidence of pretext, and because Mitchell has otherwise failed to create a genuine issue of fact regarding whether American intentionally discriminated against her because of her gender and/or her pregnancy, the court finds that American is entitled to summary judgment on Mitchell's disparate treatment claims.

          2.      Sexual Harassment/Hostile Work Environment

In her complaint, Mitchell alleges that she was subjected to a hostile work environment. In making this allegation, Mitchell appears to contend that certain comments allegedly made by Johnston created a hostile work environment: Johnston told Mitchell that he did not think that she should be working the number of hours she was working, that he felt pregnant women should be at home, that he and Dr. Irwin thought it would take a man to be in charge of the Center, that Johnston felt it would take a man to run the computers in the Center, and that Heather Shear, a receptionist at American, was fat, hot, and pregnant. Mitchell also contends that a comment by Dr. Irwin contributed to what she allegedly perceived as a hostile and abusive environment: when Dr. Irwin asked Mitchell if she knew why Johnston was at the Center, and after Mitchell replied in the negative, Dr. Irwin allegedly replied "because you're pregnant."

To establish a prima facie case of sexual harassment, a plaintiff must show:

(1) that "she belongs to a protected group;" (2) that she "has been subject to

19

> unwelcome sexual harassment, such as sexual advances, requests for sexual
> favors, and other conduct of a sexual nature;" (3) that the harassment was "based
> on [her] sex . . . ;" (4) "that the harassment was sufficiently severe or pervasive to
> alter the terms and conditions of employment and create a discriminatorily
> abusive working environment;" and (5) "a basis for holding the employer liable."

*Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000)

(citations omitted) (alterations in original).  Furthermore, "the sexually objectionable

environment must be both objectively and subjectively offensive, one that a reasonable person

would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher v.*

*City of Boca Raton*, 524 U.S. 775, 787 (1998).  To determine whether an environment is

sufficiently hostile or abusive, courts should consider the totality of the circumstances, "including

'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance.'" *Faragher*, 524 U.S. at 787-88 (citations omitted).  The court in

*Faragher* further noted that offhand comments and isolated incidents (unless extremely serious)

will not amount to discriminatory changes in the "terms and conditions of employment."

*Faragher*, 524 U.S. at 788.

Mitchell's allegations regarding the conduct of Johnston and Irwin do not establish a

prima facie case of sexual harassment.  Considering all of the comments allegedly made by

Johnston, assuming that Johnston actually made those statements, and viewing those in the light

most favorable to plaintiff, the comments do not rise to the level of severity and pervasiveness

required by the Eleventh Circuit.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999);

*Gupta v. Florida Board of Regents*, 212 F.3d 571 (11th Cir. 2000).  Though these comments were

made in a relatively short time period (from May to the end of July when Mitchell was

discharged) and though the parties dispute the number of times these comments were made, these comments were not severe, they were not physically threatening or humiliating, and they did not appear to unreasonably interfere with the employee's work performance. From reviewing Mitchell's allegations and from reviewing the evidence, the only conduct of Johnston, if any, that appeared to interfere with Mitchell's job performance was the allegedly constant inquiries by Johnston regarding the operation of the Center. Furthermore, most of the comments regarding Johnston's opinions that women should be at home and that pregnant women should not be working were purportedly made in the context of Johnston relaying the difficulties that his wife and his daughter experienced while working during their pregnancies. And though many of Johnston's comments can be considered insensitive, politically incorrect, and even offensive to Mitchell and other employees, those comments are not sufficiently abusive, hostile, severe, or pervasive to constitute actionable sexual harassment. *See Gupta*, 212 F.3d at 571 (holding that the alleged harassment was not objectively severe and pervasive to constitute actionable sexual harassment when employee's supervisor constantly complimented her on the way she looked while wearing a short skirt, called her at home frequently and asked personal questions, stared at her, touched her knee and the hem of her dress); *Mendoza*, 195 F.3d at 1238 (holding that plaintiff could not establish a prima facie case of hostile work environment where the male supervisor told the female plaintiff that he was getting fired up, rubbed his hip against the plaintiff, made sniffing sounds while looking at plaintiff's groin area, and constantly followed and stared at the employee in an obvious manner).

Though Mitchell might have viewed Johnston's remarks as subjectively offensive, these remarks, even when viewed in the light most favorable to Mitchell, could not be considered by a

21

reasonable person to be severe, hostile, or abusive. A reasonable person in the workplace is entitled to Title VII protection, but not from everything said or done that might cause hurt feelings. This court reiterates that Title VII is not a federal civility code and that Title VII does not prohibit all verbal or physical harassment in the workplace. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998); *Johnson*, 234 F.3d at 508. If the court were to find in the case at hand that the evidence established a prima facie case of sexual harassment, then the court would be extending the role of Title VII beyond its present limits.

Though there are disputes of fact as to whether Johnston participated in the decision to discharge Mitchell and whether Johnston acted in a supervisory capacity over Mitchell, the court finds that it is not necessary to reach such a decision because, as a matter of law under the Eleventh Circuit, Mitchell cannot satisfy the element of the prima facie case requiring the harassment to be severe and pervasive. Consequently, the court concludes that Mitchell has failed to establish a prima facie case of sexual harassment and that American is entitled to summary judgment.

## B.     Retaliation

Mitchell says that she was discharged in retaliation for opposing Johnston's allegedly discriminatory conduct. In support of this claim, she contends that two weeks before she was discharged she complained to Hawley of Johnston's discriminatory conduct. In approaching Mitchell's retaliation claim, the court notes at the outset that the burden-shifting framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to retaliation cases. *Fletcher v. ADT Security Services*, No. 1:99-CV-0504-CC, 2000 WL 33231616, at *11 (N.D. Ga. Dec. 7, 2000) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "To

establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal relationship between the two events." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (citations omitted). Once a prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *See Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). Upon such a showing, the plaintiff must demonstrate that the employer's articulated reasons are pretext for retaliation. *Id.*

There are genuine disputes regarding whether Mitchell ever complained about Johnston's conduct and whether she followed American's policy regarding how and to whom she should report complaints of discrimination. A genuine issue arguably exists as to whether Mitchell has established or can establish a causal relationship between her termination and any statutorily protected activity in which she engaged. Nonetheless, if the court assumes that Mitchell can establish a prima facie case of retaliation, the court finds itself in the same posture as it was above regarding Mitchell's disparate treatment claim. American has articulated a legitimate, non-retaliatory reason for discharging Mitchell–she was not performing the essential functions of her job to American's satisfaction. Again, the court finds that the articulation of this reason satisfies American's burden of production, thereby shifting the burden to Mitchell to demonstrate pretext. And on the question of whether Mitchell has established the existence of a genuine issue regarding pretext, the harsh reality for Mitchell is that, once again, she cannot carry this burden. The undisputed, objective data leads the court to conclude that the performance of the Center, at the time of her discharge, was in its second state of decline. Mitchell has not, and cannot, rebut

23

this data, and in her brief in opposition to summary judgment, she does not offer any arguments or evidence to establish a genuine issue as to whether American's reason for discharging her are mere pretext for unlawful discrimination; instead, Mitchell spends her time focusing on the issue of whether she has established a prima facie case of retaliation.  Thus, just as the court found that Mitchell could not establish pretext regarding her disparate treatment claim, the court finds that Mitchell cannot establish pretext regarding this retaliation claim.  Accordingly, American is entitled to summary judgment.

### III.  CONCLUSION

For the foregoing reasons, the motions for summary judgment must be granted in favor of American.  A separate and appropriate order will be entered.

DONE this _20__ day of August 2002.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

24